Filed 3/6/13  P. v. Pitney CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>PHILLIP PITNEY,<br><br>        Defendant and Appellant. | A128127<br><br>(City & County of San Francisco Super. Ct. No. 209488) |

After a jury trial defendant Phillip Pitney was convicted of attempted murder "done willfully and with deliberation and premeditation" (Pen. Code,[1] §§ 187, subd. (a), 664) (count one), assault with a semiautomatic firearm (§ 245, subd. (b)) (count two); and active participation in a criminal street gang (§ 186.22, subd. (a)) (count three).  As to counts one and two, the jury found true allegations of related sentence enhancements for firearm use, great bodily injury, and that the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang.  (§§ 186.22, subd. (b)(1)(C), 12022.5, subd. (a), 12022.7, subd. (b), 12022.53, subd. (d).)  As to count three, the jury found true allegations of related sentence enhancements for firearm use (§ 12022.5, subd. (a)) and great bodily injury (§ 12022.7, subd. (a)).  The jury also found true allegations that all counts were committed while defendant "was released from custody in a felony offense, on bail and on his own recognizance."  (§ 12022.1.)  The trial court sentenced defendant on the first count (attempted murder) to an indeterminate term of life with a

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

1

minimum eligible parole date of 15 years (§ 186.22, subd. (b)(5)), plus a consecutive term of 25 years to life for the personal use and intentional discharge of a firearm causing great bodily injury during the commission of a life felony (§ 12022.53, subd. (d)).[2]  The court imposed and then stayed determinate sentences and related sentence enhancements on the other two counts.

Defendant presents numerous arguments challenging his convictions and sentences.  We conclude none of defendant's arguments requires reversal of his convictions for attempted murder and assault or the jury's true findings on related gang sentence enhancements.  However, we agree with defendant that there is insufficient evidence to support his conviction for active gang participation, and we will reverse that conviction, the true findings of the sentence enhancements related to that count, and vacate the imposed sentences.  We also conclude the matter must be remanded to correct certain sentencing errors.  In all other respects, the judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

By an information filed August 10, 2009, defendant was charged with attempted murder, assault with a semiautomatic firearm, active participation in a criminal street gang, and related sentencing enhancements.  The following evidence was presented at the ensuing jury trial held in October 2009.

On April 12, 2009, Easter Sunday, the victim Ladarius Greer was shot several times on McAllister Street (McAllister) outside an apartment complex known as the Prince Hall Apartments.  The apartment complex encompasses almost an entire city block and has entrance gates on McAllister (south), Fillmore Street (west), and Golden Gate Avenue (north).  All the apartment buildings in the complex are two levels.  The second or top floor apartment on the McAllister side has a door facing the courtyard area or the apartment complex offices and at least one window facing McAllister.

---

[2]  As to count one, the court also stayed a two-year term imposed on the bail enhancement, and dismissed both the related section 186.22, subdivision (b)(1)(C) gang enhancement (*People v. Lopez* (2005) 34 Cal.4th 1002, 1007) and section 12022.7, subdivision (a), great-bodily-injury enhancement (§ 12022.53, subd. (f)).

On the day of the shooting as Elena Brancato was walking on McAllister she saw a "scuffle" between a young man wearing a hooded sweatshirt[3] and the young victim wearing a black hooded sweatshirt. When it looked like the men were going to fight, she looked away because she did not want to watch the fight. She heard gunshots, and when she looked again, the young man wearing the white hooded sweatshirt was crossing the street and shooting a gun. Brancato heard about four or five gunshots but she did not see anyone get shot. As the gunman walked passed her shooting, Brancato "quietly walked away and kept on walking and never looked back." She did not see the faces of the victim or the gunman or where the gunman went after the shooting. She was able to describe the gunman's clothing and his physical characteristics except his facial features.

Before the shooting firefighters Gavin McGoldrick and Stephanie McKnight had responded to a medical call at a ground level apartment at the Prince Hall complex on the Golden Gate Avenue side. At about 9 a.m., McGoldrick heard six to eight "real loud" gunshots right outside the apartment and he immediately ran toward the sound of the gunshots on McAllister. Seconds later, McGoldrick met a man running away from the shooting. McGoldrick described the physical characteristics of the man and his clothing.[4] One of the man's hands was in his pocket and McGoldrick did not see a gun. As they crossed paths inside the apartment complex, the man "pointed in the direction" and repeatedly yelled, "They are shooting back there." At that time the man was "jogging fast." McGoldrick then heard two unidentified persons from upper story apartments shouting "that was the shooter, that was the shooter."[5] McGoldrick turned around and

---

[3] Brancato reportedly told the police that the gunman was wearing a "a white hoodie with multicolored blue and black triangles." At trial Brancato described the gunman's sweatshirt as primarily white with an overall pattern of geometric shapes of black and turquoise.

[4] McGoldrick testified that the running man was wearing a white cotton "hoodie" with about four or five different colored designs on it.

[5] On cross-examination, McGoldrick testified that when the people shouted from the apartments, he assumed they were referring to the man who had just passed him as he was the only person around. McGoldrick did not later talk to the shouters. The shouters were at windows that faced into the courtyard of the apartment complex, not at windows

chased the man who was by then running fast. McKnight also pursued the running man, whom she described by his physical characteristics and clothing.[6] The running man stripped off his sweatshirt as he ran. McGoldrick grabbed the discarded sweatshirt and continued to chase the man but he and McKnight were unable to catch him. McGoldrick gave the sweatshirt to a police officer who put it into a paper evidence bag. The sweatshirt was later logged in as evidence in the case at the police station, and the sweatshirt was marked as defense exhibit A at the trial.[7]

About 30 minutes to two hours after the shooting, McGoldrick and McKnight separately viewed from 50 to over 170 photographs of known criminal gang members at the police station. McGoldrick identified a photograph of defendant as looking "a lot like" the man he chased through the apartment complex. In court McGoldrick identified defendant as looking like the selected photograph and the man he saw running through the complex. McKnight identified two photographs possibly looking like the man she had chased; one of the photos was of defendant. In court McKnight identified defendant as looking like the man she saw running from the apartment complex.

San Francisco Police Officer William Ahern was the first officer to arrive at the scene of the shooting. The victim was lying on the sidewalk. The victim said he had been shot and the gunman had run into the Prince Hall Apartments. The victim described

---

facing towards McAllister. McGoldrick did not know if the shouters had seen the shooting.

[6] McKnight testified the running man was wearing a rather large hooded zippered mostly white sweatshirt with graphics covering the entire garment.

[7] Defense counsel questioned Brancato, McGoldrick, and McKnight regarding defense exhibit A. Brancato said defense exhibit A, which had been shown to her just before her testimony, was not the sweatshirt worn by the shooter. McGoldrick said defense exhibit A was not the discarded sweatshirt that he had handed to an unidentified uniformed police officer. After McGoldrick gave the discarded sweatshirt to the police officer, McGoldrick did not see it again and he did not know if two sweatshirts had been logged into evidence. McKnight said she would be able to identify the discarded sweatshirt if she saw it again. When asked if defense exhibit A looked like the discarded sweatshirt, McKnight said, "I remember it being more white," and "[i]t looks similar, but there's something not quite right."

the gunman's clothing—a white hoodie and brown pants, but he did not identify the shooter.

The day after the shooting San Francisco Police Officer Damon Jackson took over as the investigating officer assigned to the case. He conducted a "follow-up investigation, request for tests to be made, whether it be blood, DNA, gunshot residue. Interviewing witnesses and suspects, victims, issuing warrants." He did not order a DNA analysis or gunshot residue (GSR) test on the recovered sweatshirt for several reasons: the day after the shooting the victim had identified defendant as the shooter, the officer had three unrelated identifications of defendant, there was an issue as to the timing of the GSR test; and there was a backlog on DNA processing in San Francisco so that the results would not have been available for either the preliminary hearing or the trial.

Officer Jackson secured a video surveillance tape of the Prince Hall Apartments that had been made on the day of the shooting. At "9:11:45," the videotape showed an unidentifiable person running from a gate on McAllister and through the courtyard of the apartment complex. The person was wearing a "a hooded multicolored sweatshirt, running." The officer believed the sweatshirt admitted as defense exhibit A was the same sweatshirt depicted in the still photographs taken from the videotape.

Officer Jackson looked for defendant after the shooting. Defendant was required to be at school five days a week pursuant to a court order as part of his probation. When Jackson went to defendant's school, the officer could not locate him there. A week after the shooting, Officer Jackson arrested defendant at the office of defendant's probation officer. When Officer Jackson saw defendant, he commented that defendant was hard to find. Defendant replied he had been at school. The officer responded the police had been at defendant's school every day and defendant had not been there.

Officer Jackson also testified as the prosecution's expert in San Francisco criminal street gangs, specifically with respect to the Western Addition neighborhood where the incident took place. He had been a police officer for nine years and at the time of the trial he had been assigned to the Gang Task Force for about two and a half years. Since he had been assigned to the gang task force he had attended two courses on gangs—a one-

5

hour course and a two-day course. However, his expertise was based primarily on his activities as a street officer and conversations with other officers regarding gang activity. He had personally observed gang-related activity in the Northern District of the Western Addition for about four years. He had personally executed about 50 search warrants at the homes of gang members, conducted "hundreds" of specific criminal gang investigations, handled "hundreds" of arrests concerning crimes committed by gang members, and had "hundreds" of both consensual and/or investigatory conversations with gang members. The conversations concerned the lifestyles and attitudes of criminal street gang members and how gang members committed crimes.

Officer Jackson described the nature of the Western Addition gangs. Unlike most traditional gangs, Western Addition gang members tended to be more family-oriented. The gang members might or might not live in the area, but they had family and friends who lived in the area. A person became a member not by proving how tough he was, but by having someone basically vouch for him. Western Addition gang members showed their loyalty by confronting other gang members or individuals associated with gangs from rival areas. "It could be something as simple as confronting them, asking them if they are part of that group or organization. It can be shooting at rival gang members and associates, it can be plain disrespect them, rob them." Jackson had experience observing or investigating crimes with regard to the robbery of gold chains, which item symbolized a gang member's status. Jackson also commented that if a gang member was disrespected by someone and the gang member did not take action, then the gang member would lose respect. A gang member's act of violence had an impact on his stature and the level of respect shown to him.

Officer Jackson opined that as of April 12, 2009, Eddy Rock was a "criminal street gang," which was "an ongoing group or association" consisting of "three or more people." The gang members had common hand signals. Eddy Rock gang members had recently adopted red bandanas, red clothing, and began using the phrase "Soo Woo," "a traditional blood call from the blood gang in LA." On cross-examination, Jackson further explained the composition and structure of the Eddy Rock gang. "The juveniles that are

6

the only ones left in Eddy Rock now, they transitioned to this whole red Soo Woo movement . . . . [T]he gangs are fluid due to death, incarceration, or someone just moving out of the area. [¶] There's been generations in Eddy Rock. The generation that [the officer] was exposed to from the moment [he] got there [were] all incarcerated, on the gang injunction, or have stay-away orders. [¶] The next generation . . . was [defendant] and his friends. A lot of those individuals are on the gang injunction, incarcerated, or have moved. [¶] So now you are left with the juveniles, and they identify with the red. . . ." The officer believed if defendant was released, he would probably be the oldest individual still in the gang even though he was only 19 years old. Eddy Rock gang was not structured and did not have an "entrance incident" after which a person became a gang member. Instead, a person became a member by "active participation" in acts committed for the gang against other gangs, "knowledge of the criminal acts that [were] being engaged [in] by members of that gang," and "willingness to assist, promote or further those acts in that gang."

Officer Jackson also opined that as of April 12, 2009, Eddy Rock gang members engaged in a "pattern of criminal activity," including narcotic sales, robbery, burglary, murder, prostitution, auto burglaries, fencing of stolen goods, and the purchasing and selling of firearms. Most of the property crimes were for monetary gain and the violent crimes were to increase the gang members' reputations and respect and for retaliation. Officer Jackson identified defendant and two other men as members of the Eddy Rock gang. The two known gang members had various convictions for narcotics, burglary, and assault with a firearm. In 2008, defendant had been convicted of grand theft from a person based on a June 26, 2008, offense during which "[a]n individual was robbed at gunpoint in Eddy Rock Gang territory and stripped of his belongings."

Officer Jackson opined defendant was a gang member based on his documented criminal history going back to 2003, his criminal activities with gang members over many years, and his identification as a Eddy Rock gang member by rival gang members who had spoken to the officer. In 2003 defendant was seen in the company of other gang members entering a car that was burglarized; in 2005 defendant and other gang members

7

were booked for attempted burglary and conspiracy to commit burglary; and in 2006 defendant and other gang members were booked for burglary and conspiracy to commit burglary. In 2007, there were four documented reports of defendant's activities with known gang members: (1) defendant and numerous gang members were detained during the execution of a search warrant where 17 rocks of base crack cocaine were found in the unit block of Eddy that the gang claimed as its territory; (2) defendant was present at the shooting involving a known gang member; (3) during the execution of a search warrant at defendant's residence, the police found numerous items of Eddy Rock gang "indicia, being photos, documents of gang names, individuals who were gang members who might be deceased, things of that nature;" and (4) defendant was seen in the company of gang members who had been served with a copy of the City's gang injunction. Officer Jackson was personally involved in the execution of the search warrant at defendant's residence, and identified photographs depicting the gang-related items found in defendant's room. In June 2008, there were two incidents, including one that lead to defendant's pleading guilty to grand theft. In February 2009, there was a pending criminal case against defendant based on an incident in which "four or five guys" were found "cutting up a couple of ounces of marijuana." In that case the court ordered defendant to stay away from the "1200 block of Eddy as well as the codefendants in the case." In March 2009, the court further ordered defendant to attend a charter school five days a week and to stay away from "pretty much all of the Eddy Rock territory." Officer Jackson also described an altercation between defendant and a Chopper City gang member that occurred when defendant was incarcerated after the underlying shooting incident in April 2009. According to Jackson, Chopper City gang members and Eddy Rock gang members had been involved in retaliatory shootings and homicides over the years. "The shootings have been consistent over the years since about 2005." Defendant had been involved in physical altercations with a couple of Chopper City gang members "this year." The officer had seen defendant "on video in an altercation with the same individual he got in a fight with in the jail, in Prince Hall Apartments."

8

At the time of his arrest in June 2008, defendant did not admit he was in a gang for the purpose of jail cell classification. According to Jackson, defendant was "smart enough to know that he didn't want to classify himself as a gang member." Defendant said he had "friends who claim Fillmore and would rather be housed with them." Defendant "was housed with guys from the Fillmore. Because he did not give a specific gang that he wanted to be housed with, he was housed with individuals from other gangs, and he ended up getting into a fight with those individuals, in jail." During his incarceration for the current April 2009 offenses, defendant was again questioned about his gang affiliation for the purpose of jail cell classification. When asked if he was part of a gang, defendant stated, "I grew up in the Fillmore and got friends who bang," but he did not state Eddy Rock specifically.

Based on his investigation, Officer Jackson believed defendant had committed the charged crimes against Greer for the benefit of or in association of the Eddy Rock criminal street gang because defendant was a gang member "[i]n the opinion of all of the other gangs that surround Eddy Rock, they believe that [defendant] is an Eddy Rock gang member." "The act that took place on McAllister is two blocks from the police station, it's on Easter Sunday in front of numerous individuals right in between two churches," and the location was the place where "six individuals who are associates and members of other gangs were shot almost in that same location in 2007." It was very significant that defendant, recognized as a Eddy Rock gang member, was in an area where six rival gang members had been previously shot, the incident took place on a holiday, two blocks from the police station, and the victim who was shot knew defendant. Even if no one else was around, "the way that things happen in gang neighborhoods," is that "individuals always find out and know who shot another individual." Consequently, defendant's stature "is upped by the shooting itself, the manner in which it was committed, no fear of witnesses, no fear of location . . . ." The incident showed that "any time, anywhere outside of gang turf in other members' gang turf, if you are out and you have a problem with members of Eddy Rock, this is how we handle it."

9

In reaching his opinion, Jackson also considered two incidents between defendant and the victim. A week before the shooting, defendant and a known gang member had "robbed [the] victim of his gold medallion. [¶] . . . [¶] [m]aybe the chain."[8] On another occasion, the victim and defendant met outside the Hall of Justice. Defendant tried to shake the victim's hand, but the victim refused because he did not shake anyone's hand. According to the victim, defendant felt disrespected, walked off, and said, "Let me go put this thing up before I have to use it in a manner in which – acting as if he had a gun." However, the victim told the officer "there's no way" defendant had a gun, and the victim just left the Hall of Justice.

## DISCUSSION

### I. Admission of Evidence

We review the trial court rulings regarding the admission of evidence for an abuse of discretion. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1007-1008.) As we now discuss, we conclude defendant's challenges to the admission of certain evidence do not require reversal.

#### A. *Victim's Statement that Defendant Shot Him*

#### 1. Relevant Facts

Before trial the prosecutor sought permission to introduce the victim's statement that defendant was the shooter through the testimony of Officer Jackson who had interviewed the victim on the day after the shooting. The prosecutor believed that, although the victim had been subpoenaed to appear at trial, he would not appear and that defendant was responsible for the victim's failure to appear. The prosecutor argued that as a consequence of defendant's wrongdoing, he had forfeited his right of confrontation

---

[8] The victim's mother Shaunte Spruell testified about the chain snatching incident as described to her by the victim. As the victim was leaving his girlfriend's home, he ran into defendant and another man. Defendant "pulled a gun and they robbed him and took his chain." Spruell described the chain as "a long silver chain, a scorpion [medallion] on it." When the chain and medallion fell to the ground, the victim recovered the medallion but not the chain. On cross-examination, Spruell stated that the victim, who knew defendant, never reported the incident to the police. Spruell also denied that she told the police the chain was a "gold" chain.

10

as enunciated in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and its progeny, including *Davis v. Washington* (2006) 547 U.S. 813. After a hearing, the court found defendant was not responsible for the victim's failure to appear at trial. Consequently, the court denied the prosecutor's request to allow Officer Jackson to testify that the victim had identified defendant as the shooter.

However, the trial court reconsidered its ruling after defense counsel's cross-examination of two witnesses, Sergeant Tom Walsh and Officer Jackson, who both confirmed that the police had not ordered a DNA test or gunshot residue (GSR) test of defense exhibit A, which was the sweatshirt purportedly discarded by the shooter.[9] Defense counsel's cross-examination prompted the prosecutor to request that Officer Jackson be allowed to testify as to his reasons for not ordering the tests, which included the fact that the day after the shooting the victim had identified defendant as the shooter.

After considering defendant's objections, the trial court granted the prosecutor's request to allow Officer Jackson's testimony. In so ruling, the court explained: "As the

[9] During cross-examination of Sergeant Walsh, defense counsel questioned the officer about the use of a gunshot residue (GSR) test on clothing to determine if a person had recently fired a gun. The officer said GSR was considered "fleeting evidence," and it was recommended that it be collected within four hours of a person firing a weapon. Although the timing was close, the officer believed the sweatshirt had been collected in sufficient time to test it for GSR. However, no request was made and the sweatshirt was not tested for the presence of GSR. At the conclusion of Walsh's testimony, the court asked the witness "some follow-up questions from the jurors." The court asked, "Any DNA evidence on the suspect's sweatshirt?" The officer replied he did not know if a DNA analysis was done on the suspect's sweatshirt. "Clothing is a source of DNA. I don't know if any analysis was done on that." The court also asked, "Would it be routine CSI practice to test for GSR from a potential shooter's clothing or a shooting crime scene? The officer replied, "No. I only do that at the request of the investigating officer who is assigned the case." During cross-examination of Officer Jackson, defense counsel asked the following questions: "Q. Now, as the officer in charge of the case, I think you testified—[you're] the fellow [who] would be in charge of asking for testing to be done on the evidence? [¶] A. That's correct. [¶] Did you ever ask that the suspected—[¶] The sweatshirt supposedly worn by the suspect, did you ask that be tested for DNA? [¶] A. I did not request tests on the sweatshirt due to the victim's statement—[¶] [Defense Counsel]: Excuse me, Your Honor. That's nonresponsive and I would move to strike any further . . . answer. [¶] The Court: Motion granted."

11

People have indicated and . . . Defense Counsel would also agree, the central issue in this case is identification. [¶] The issue here is whether a statement, identifying defendant as the perpetrator of a shooting, to the gang expert witness, Officer Jackson, by the victim, . . . is now admissible to rehabilitate Officer Jackson's testimony regarding the failure to obtain various forensic tests from the jacket or sweatshirt seized by [the] police as part of its investigation. [¶] The Court has already ruled . . . that [the victim's] identification is testimonial and therefore to be excluded. [¶] The statement was given to Officer Jackson at a time, apparently, when the primary purpose of law enforcement was not to deal with an ongoing emergency but to investigate the circumstances of a crime; i.e., . . . to establish or prove some past fact . . . . [¶] However, the Court has found that Defense Counsel has indeed opened the door [to the admission of the victim's statement] by asking Sergeant Walsh in one instance and Officer Jackson in another who was responsible for obtaining tests, whether tests were ordered, and why DNA evidence, if any, was not ordered recovered . . . from Defense Exhibit A[,] . . . which is the sweatshirt [that] was discarded purportedly by the perpetrator of this offense. [¶] Defense Counsel states that he intended to tread lightly with respect to cross-examination of Sergeant Walsh and Officer Jackson with regard to DNA sampling only. [¶] But the effect of his questions and the responses that he elicited is that he has opened the door to an inference that Sergeant Walsh and particularly, Officer Jackson are to be faulted for not ordering such tests in a case where identification is clearly the central issue before the jury. [¶] Indeed, there were at least two questions posed by the jury that the Court asked of Sergeant Walsh about DNA and GSR. . . . [¶] The Court is very concerned that if Officer Jackson cannot . . . explain why the tests were not taken, that the jury would be misled as to his credibility as a witness. [¶] The statement would be offered for a limited purpose, not for the truth of the matter, [b]ut solely to explain why Officer Jackson did not order these forensic tests."

The trial court also engaged "in an Evidence Code Section 352 analysis regarding the admissibility of the statement. [¶] On the one hand, the Court is well aware of the constitutional implications of the defendant's right to confrontation and the prejudice

12

resulting from the admission of the statement identifying defendant. [¶] On the other hand, the Court has a responsibility to ensure . . . the integrity of the proceedings[,] . . . the administration of justice and the interest[s] of justice, especially where it would be clearly misleading to the Court and to the jury to exclude evidence which would explain why Officer Jackson did not order such tests. [¶] After considering the papers, the oral arguments of the counsel, and the applicable case law, and weighing the significance of the evidence, the Court finds under [the] Evidence Code Section 352 balancing test that in the interest[s] of justice, the probative value of the identification outweighs its prejudicial value and impact on the jury; that accordingly, substantial prejudice would not result."

The trial court ruled Officer Jackson would be limited to testifying that one of his reasons for not ordering forensic tests was that the victim had said defendant was the person who shot him. Officer Jackson was not permitted to use adjectives like "100 percent sure" regarding the victim's identification or to refer to a " 'two-and-a-half-hour interview' " with the victim.[10]

### 2. Analysis

Defendant argues the trial court committed both federal constitutional and state law error by admitting into evidence—through the testimony of Officer Jackson—the victim's statement identifying defendant as the shooter. We disagree.

We initially conclude the trial court did not err in ruling that defendant opened the door to the admission of the victim's statement. *U.S. v. Cruz-Diaz* (1st Cir. 2008) 550 F.3d 169 (*Cruz-Diaz*) is instructive and persuasive authority supporting the trial court's ruling. In that case, defendants Angel Zamora Cruz-Díaz (Cruz) and José Alfredo Ayala-

---

[10] The trial court also ruled that defense counsel's cross-examination of Officer Jackson regarding his knowledge of the victim's credibility would be limited. Although defendant mentions this ruling, he presents no substantive argument that the ruling requires reversal. Consequently, we do not further address the issue. (But see *People v. Brown* (2003) 31 Cal.4th 518, 545-546 (*Brown*) [" '[u]nless the defendant can show that the prohibited cross-examination would have produced "a significantly different impression of [the witness's] credibility" [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment.' "].)

Colón (Ayala) were convicted of several offenses arising from an armed bank robbery. (*Id*. at pp. 171.)  After the robbery, the police received information that defendants were traveling in a red Mazda.  (*Ibid*.)  "Shortly thereafter, police officers discovered an abandoned car matching this description.  Near the car, they found [the defendants].  A search of the area yielded a black plastic bag containing money from the bank.  A search of the red Mazda produced a bullet casing on the passenger's seat.  The bullet casing corresponded with a nine-millimeter Luger brand bullet or cartridge.  No guns, however, were ever found."  (*Id*. at pp. 171-172, fn. omitted.)  The trial court allowed an FBI agent to testify regarding an out-of-court statement made by Cruz to the authorities.  (*Id*. at p. 175.)  The agent testified "about Cruz's statement after Ayala's counsel, via cross-examination, questioned a Puerto Rico police officer about the failure of the police to pursue various investigatory options after [they] detained the two defendants."  (*Ibid*.)  "The agent, who was the 'case agent' for the investigation, explained that the FBI and Puerto Rico police failed to pursue certain investigatory options because they believed they had captured the right suspects.  In doing so, the agent referred to Cruz's out-of-court statement while testifying that: [¶] [']I became aware at the time of the detention of the two defendants that [Cruz] had stated to [the officer] who gained custody of him, that . . . "the money is over there in a black bag, we already threw away the weapons," and something to the effect of, "we're screwed, less than five minutes and they caught us." [,] "(*Ibid.*)

The First Circuit Court of Appeals rejected Ayala's contention that his right of confrontation as enunciated in *Crawford* had been violated by the admission of Cruz's statement.  (*Cruz-Diaz, supra*, 550 F.3d at pp. 176, 178.)  The court explained that Ayala's "trial strategy opened the door to the statement's admission" (*id*. at p. 176) by defense counsel "pointedly cross-examining a police officer about the decision not to pursue certain investigatory opportunities after apprehending the defendants.  Counsel focused on potential fingerprint and DNA evidence the police could have gathered from the red Mazda and sent for analysis.  In total, Ayala's counsel identified 'eleven missed opportunities' to tie Ayala to the red Mazda.  Faced with this line of questioning, the

14

government sought to introduce the FBI agent's testimony to explain why the FBI and police did not lift forensic evidence from the car." (*Id*. at p. 178.) The court also rejected Ayala's suggestion that the government could have entirely avoided mentioning Cruz's confession by having the agent testify "that the government chose to truncate the investigation 'because of information [the agent had].' " (*Ibid*.) "Given the tenor of Ayala's cross-examination about the authorities' failure to investigate further, the use of the generalized narrative Ayala suggests would have come at an unjustified cost to the government. During cross-examination, Ayala's counsel painted a picture of police and FBI ineptitude, observing that the government missed eleven opportunities to tie Ayala to the car, and thus, to the crime. Generalized testimony limited to an explanation such as 'we stopped investigating because of information received,' without any context, would not have sufficiently rebutted Ayala's line of questioning." (*Ibid*.) The court concluded by noting that the case before it "fits comfortably within the rule of" *Tennessee v. Street* (1985) 471 U.S. 409. (*Cruz-Diaz, supra*, at p. 179.) "[T]he district court admitted Cruz's out-of-court statement not to prove the truth of the matter asserted but to rebut Ayala's attempt to cast doubt on the integrity of the government's investigatory efforts. The district court instructed the jury as to the limited nature of the statement's admission. And the government's interest in introducing the substance of the confession, rather than a more sanitized narrative, was both legitimate and strong." (*Id*. at pp. 179-180.)

Although defendant cites *Cruz-Diaz,* he does not distinguish the case from the circumstances presented here. Instead, he asks us to consider an earlier federal Sixth Circuit Court of Appeals decision in which the court held that even if the defendant opens the door to the admission of a testimonial out-of-court statement, such conduct is not sufficient "to erase" the violation of the confrontation right. (*U.S. v. Cromer* (6th Cir. 2004) 389 F.3d 662, 679 (*Cromer*).) However, the *Cromer* decision cites no authority for the proposition that a defendant cannot open the door to the admission of evidence that would be otherwise barred by the Confrontation Clause. Additionally, the United States Supreme Court has subsequently held that its *Crawford* decision is not a watershed rule necessary to the fundamental fairness of a trial and the accuracy of criminal proceedings.

(*Whorton v. Bockting* (2007) 549 U.S. 406, 409, 417-421 [refusing to apply *Crawford* rule retroactively to cases already final on direct review].) Thus, we agree with those federal and state courts that have rejected *Cromer* and held that " 'a defendant can open the door to the admission of evidence otherwise barred by the Confrontation Clause.' " (*People v. Reid* (2012) 19 N.Y.3d 382, 387-388, and the cases cited therein.) As the court explained in *Reid*, "If evidence barred under the Confrontation Clause were inadmissible irrespective of a defendant's actions at trial, then a defendant could attempt to delude a jury 'by selectively revealing only those details of a testimonial statement that are potentially helpful to the defense, while concealing from the jury other details that would tend to explain the portions introduced and place them in context' [citation]. A defendant could do so with the secure knowledge that the concealed parts would not be admissible under the Confrontation Clause. To avoid such unfairness and to preserve the truth-seeking goals of our courts [citation], we hold that the admission of testimony that violates the Confrontation Clause may be proper if the defendant opened the door to its admission." (*Id.* at p. 388.)

Like the situation in *Cruz-Diaz, supra*, 550 F.3d at p. 177, in this case defendant's counsel pointedly questioned Sergeant Walsh and Officer Jackson about pursuing investigatory opportunities after apprehending defendant. Defense counsel focused on potential gunshot residue and DNA evidence the police could have gathered from the sweatshirt and sent for analysis. Faced with that line of questioning, the prosecutor sought to introduce evidence explaining why Officer Jackson, the investigating officer, did not order the forensic tests. In opposing the prosecutor's request, defense counsel said he intended to put at issue the integrity of the police investigation by questioning the witnesses about forensic tests. Indeed, counsel specifically conceded that even if the court had made an advance ruling that such questioning would open the door to the admission of the victim's statement, counsel would still have chosen to question the witnesses on the issue.

We also reject defendant's argument that the trial court should have adopted his counsel's suggestion that Officer Jackson not mention the substance of the victim's

16

statement. The prosecutor's "interest in introducing the substance of the [victim's statement], rather than a more sanitized narrative, was both legitimate and strong." (*Cruz-Diaz, supra*, 550 F.3d at pp. 179-180; see *People v. Scheid* (1997) 16 Cal.4th 1, 16 ["it is immaterial for purposes of determining the relevance of evidence that other evidence may establish the same point"].) At the time the issue arose, the trial court here was faced with a defense strategy that had put at issue the integrity of the police investigation as reflected by defense counsel's cross-examination and the jurors' questions. The jury had also heard testimony that the victim had not identified the shooter on the day of the shooting. Thus, the trial court reasonably could have found that a vague reference to an interview with the victim the day after the shooting would not be sufficient to permit the jury to make an informed decision regarding the reasonableness of the officer's conduct in failing to order forensic tests.

Concededly, a victim's identification of a defendant as the perpetrator is the most prejudicial type of evidence because it is highly probative evidence. However, " '[p]rejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional basis against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt.' " (*People v. Valdez* (2012) 55 Cal.4th 82, 133.) " '[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 438-439 (*Doolin*).) In this case, the challenged testimony was not of a character that required the court to exclude it as being more prejudicial than probative. There was nothing inflammatory in Officer Jackson's brief references to the victim's statement. In closing arguments, both defense counsel and the prosecutor informed the jurors of the limited purpose for which they could consider the victim's statement made to Officer Jackson. The trial court also "drove this point home to the jury on two separate occasions." (*Cruz-Diaz, supra,* 550 F.3d at

17

p. 177.)  At the time Officer Jackson gave the challenge testimony, the court advised the jury the victim's statement was not being offered for the truth of the matter but to explain why the officer did not order forensic tests as part of his investigation.  When giving the jury its final instructions, the court again advised the jury:  "During the trial, certain evidence was admitted for a limited purpose.  You may consider that evidence only for that purpose and for no other. [¶] The statement by [the victim] is not offered for the truth of the matter, but to explain why Officer Jackson did not order forensic tests as part of his investigation."

We see no merit to defendant's various arguments that the admission of the victim's statement was so prejudicial as to render his trial fundamentally unfair in violation of his right to due process.  "To the extent defendant on appeal raises a federal constitutional claim distinct from his claim that the trial court abused its discretion [in admitting the evidence], he forfeited this claim by failing to identify that ground in his objections to the trial court.  [Citation.]  To the extent any constitutional claim is merely a gloss on the objection raised at trial, it is preserved but is without merit because the trial court did not abuse its discretion" in admitting the evidence.  (*People v. Riggs* (2008) 44 Cal.4th 248, 292 (*Riggs*).)  Specifically, we see no merit to defendant's argument that the jury could not have realistically been expected to limit the use of the victim's statement to its evaluation of Officer Jackson's reasons for not ordering forensic tests.  "The assumption that jurors are able to follow the court's instructions fully applies when rights guaranteed by the Confrontation Clause are at issue."  (*Tennessee v. Street, supra*, 471 U.S. at pp. 415-416, fn. 6; see *People v. Fuiava* (2012) 53 Cal.4th 622, 689 & fn. 24 (*Fuiava*).)  "Jurors are routinely instructed to make . . . fine distinctions concerning the purposes for which evidence may be considered, and we ordinarily presume they are able to understand and follow such instructions."  (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.)  Defendant has not demonstrated nor does the record indicate either a reasonable possibility or a substantial likelihood that the jurors failed to comply with the instructions and considered the victim's statement for an improper purpose.

We also see no merit to defendant's contention that the victim's statement was unreliable hearsay and did not meet the requirements for the declarant's state of mind exception to the hearsay rule pursuant to Evidence Code section 1250. The victim's statement was not hearsay and therefore its admissibility was not subject to the hearsay rule or any exception to that rule. "[A]n extrajudicial statement is hearsay evidence only when it '*is* offered to prove the truth of the matter stated.' (Evid. Code, § 1200.)" (*People v. Anthony O.* (1992) 5 Cal.App.4th 428, 435.) Here, the victim's statement "is an example of ' "one important category of *nonhearsay evidence*—evidence of a declarant's statement that is offered to prove that the statement imparted certain information to the hearer and that the hearer, believing such information to be true, acted in conformity with that belief. *The statement is not hearsay*, since it is the hearer's reaction to the statement that is the relevant fact sought to be proved, not the truth of the matter asserted in the statement." ' " (*People v. Livingston* (2012) 53 Cal.4th 1145, 1162, italics added; see *Fuiava, supra*, 53 Cal.4th at p. 689 [court properly admitted testimony that witness heard someone say defendant " 'did it' " for the nonhearsay purpose of establishing witness's state of mind]; *People v. Samuels* (2005) 36 Cal.4th 96, 122 [court properly admitted out-of-court statement to explain witness's subsequent actions].)

## B.     *Anonymous Persons' Statements That Defendant Was the Shooter*

### 1.     **Relevant Facts**

Before trial the prosecutor moved in limine to admit the testimony of firefighter McGoldrick that immediately after the shooting defendant ran by him, spontaneously saying, "They're shooting over there," and as defendant ran passed him, McGoldrick heard two people shout that the running man was the shooter. The prosecutor argued the anonymous persons' statements were admissible as spontaneous declarations pursuant to Evidence Code section 1240.

At an Evidence Code section 402 hearing to determine the admissibility of the evidence, McGoldrick testified that after hearing six or eight gunshots, he ran in the direction of the sound of the gunshots. He encountered a man, whom he later identified as defendant, who looked at McGoldrick and said, "They are shooting back there," and

19

defendant pointed in the direction of the gunshot sounds. After McGoldrick and defendant passed each other, McGoldrick heard two voices coming from the second or third story of the apartment complex. He looked up, and saw two faces each in a different window behind screens. The people were looking down at McGoldrick and repeatedly saying, either "He was the shooter," or "That's the shooter." McGoldrick assumed the people "saw the shooter and saw it go down," and were talking about the man who had just passed McGoldrick because that man was the only person who had passed McGoldrick. McGoldrick turned around and chased defendant. McGoldrick heard the people in the windows shouting maybe 30 or 40 seconds after he had initially heard the gunshots and ran towards the sound of the gunfire. The trial court ruled McGoldrick would be permitted to testify regarding the statements made by the anonymous persons: "The declarant[s], that is, the individuals who stated 'That's the shooter,' described, explained that condition or event. It is spontaneously made under stress and exciting event. There's no reflection here, and the statement relates to the event which causes it. [¶] And the Court, hearing this, . . . clearly believes that this is a statement admissible under Evidence Code section 1240 as an exception to the hearsay rule. It is a spontaneous statement. It meets all of the conditions for its admission."

### 2.    Analysis

Defendant argues the trial court committed both federal constitutional and state law error by admitting into evidence, through the testimony of McGoldrick, the anonymous persons' statements that defendant was the shooter. We disagree.

"Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." (Evid. Code, § 1240.) In order to qualify as a spontaneous declaration,"(1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and

20

the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it." (*People v. Poggi* (1988) 45 Cal.3d 306, 318 (*Poggi*); see *Brown, supra,* 31 Cal.4th at pp. 540-541.) Whether the requirements of Evidence Code section 1240 are met is largely a question of fact within the discretion of the trial court, and " 'each fact pattern must be considered on its own merits . . . .' " (*People v. Riva* (2003) 112 Cal.App.4th 981, 995 (*Riva*); see *Poggi, supra*, at p. 318.)

Defendant argues there was insufficient foundational evidence to admit McGoldrick's testimony because "[t]here was no evidence at all that the anonymous [persons] actually witnessed the shooting or were even in a position to have witnessed it." However, "[t]he Evidence Code does not use the term 'witnessed by.' Rather, it refers to an act, condition, or event 'perceived by' the declarant. (Evid. Code, § 1240, subd. (a).) . . . [S]pontaneous statements may include the ' " 'sincere expression' " ' of the speaker's ' " 'actual impressions and belief.' " ' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 810 (*Blacksher*) [court upholds admission of declarant's out-of-court spontaneous statements that defendant shot the victims despite declarant's in-court testimony that she could not see into the dining room where the shots were fired and she did not tell anyone she had actually seen the shootings].) The " 'foundation, or preliminary fact [required to admit a spontaneous statement], require[s] only proof by a preponderance of the evidence. [Citation.] In making its factual determination the trial court exercises discretion. [Citation.] If substantial evidence supports the exercise of that discretion we must uphold it.' " (*People v. Gutierrez* (2000) 78 Cal.App.4th 170, 177-178 (*Gutierrez*).)

*Gutierrez* is instructive and persuasive authority supporting the trial court's ruling. In that case, a family was robbed by two men at gunpoint in a parking lot. (*Gutierrez, supra*, 78 Cal.App.4th at p. 173.) Soon after the robbers departed, one victim was approached by an unidentified man who handed him a piece of paper with a license plate number written on it. (*Id.* at pp. 173, 176.) The man, who appeared nervous and scared, said he had taken the license plate number. (*Id.* at p. 176.) The police later determined the license plate number had been assigned to the van used as the robbers' getaway vehicle. (*Id.* at p. 173.) The trial court did not allow testimony as to what the

21

unidentified man said when he handed the piece of paper to the victim. (*Id.* at p. 176.) However, the court allowed into evidence the piece of paper containing the license plate number as a spontaneous statement under Evidence Code section 1240. (*Ibid*.) The appellate court upheld the ruling. (*Id*. at p. 181.) "Although no direct evidence was introduced on the point, there was evidence from which it could be inferred the declarant had witnessed the robbery. . . . 'According to [the robbery victim,] he was robbed in the parking lot of a market and the two suspects got into a mini-van and drove away . . . . The unidentified man then approached [the robbery victim] and gave him the license plate number of the mini-van, which he had written down. . . . Had the unidentified man not witnessed the robbery, there would have been no reason for him to write down the license plate number and give it to [the robbery victim].' " (*Id*. at p. 178.)

As in *Gutierrez*, the trial court here reasonably could infer that the anonymous persons had seen the shooting. In the absence of any evidence that the anonymous persons knew defendant, there would have been no reason for them to shout at McGoldrick to cause him to turn around and pursue defendant unless they had seen the shooting. (*Gutierrez, supra*, 78 Cal.App.4th at p. 178.) Defendant's arguments as to why the anonymous persons might have identified him even if they had not seen the shooting go to the weight of the evidence, not its admissibility. (See *Blacksher, supra*, 52 Cal.4th at p. 811; see *Riva, supra*, 112 Cal.App.4th at p. 996.) Also, the trial court here could reasonably infer the anonymous persons were acting under the stress of having seen the shooting and before they had a chance to reflect on their statements. Although McGoldrick could not see the anonymous persons or describe the tone of their voices, they repeatedly yelled at him seconds after he had heard the gunfire and crossed paths with defendant. (See *McLaughlin v. Vinzant* (1st Cir. 1975) 522 F.2d 448, 451 [court could permissibly draw inference that declarant possessed firsthand knowledge of killing leading her to announce defendant shot the victim from the force of the statement and the fact she was somewhere in the vicinity of the fatal event even though there was no evidence of precisely where declarant was and what events she witnessed].) At best, defendant's arguments demonstrate only that a court might have concluded the

22

statements did not constitute spontaneous declarations. The arguments "simply do[ ] *not* show that a court was unable to arrive at the opposition conclusion. Therefore, [they do] not establish an abuse of discretion." (*People v. Gordon* (1990) 50 Cal.3d 1223, 1253, overruled on another point in *People v. Edwards* (1991) 54 Cal.3d 787, 835; see also *People v Thomas* (2011) 51 Cal.4th 449, 496 [" '[T]he discretion of the trial court is at its broadest' when it determines whether an utterance was made while the declarant was still in a state of nervous excitement. "].)

Defendant also contends the admission of the anonymous persons' statements violated his rights under the confrontation clause as enunciated in *Crawford* and its progeny. However, as defendant correctly concedes, he did not specifically lodge a confrontation clause objection to the admission of the statements.[11] Defendant's "objection [in the trial court]—that the [statements] did not come within a state-law exception to the hearsay rule . . . presented legal issues different from those underlying an objection that the admission of testimony would violate the confrontation clause. Therefore, defendant's new objection on appeal is not merely a constitutional 'gloss' upon an objection raised [in the trial court], and is forfeited." (*People v. Redd* (2010) 48 Cal.4th 691, 730, fn. 19 [hearsay objection did not preserve confrontation clause objection].)

Even if the confrontation clause claim had been preserved, it would fail because the anonymous persons' statements were not "testimonial hearsay subject to [defendant's] right of confrontation." In determining whether a statement, otherwise admissible under a hearsay exception, is testimonial, "[i]t is the 'primary purpose of creating an out-of-court substitute for trial testimony' that implicates the confrontation clause." (*Blacksher, supra,* 52 Cal.4th at p. 813, quoting from *Michigan v. Bryant* (2011) 562 U.S. __, ___ [131 S. Ct. 1143, 1155] (*Bryant*).) "*Bryant* counsels that to determine

---

[11] The prosecutor's motion in limine to admit the anonymous persons' statements included an argument that the evidence would not violate defendant's rights under the confrontation clause. Defendant presented no opposing argument and neither party asked the trial court to rule on the confrontation clause issue.

the primary purpose with which a statement is given by the declarant or obtained by an officer[12] a court must consider a number of factors," including: (1) an objective evaluation of "the circumstances of the encounter along with the statements and actions of the parties;" (2) an objective analysis of "whether an ' "ongoing emergency" ' exists, or appears to exist, when the statement was made," and whether "an ongoing emergency focuses the participants on something other than obtaining evidence for trial;" (3) "[a] nontestimonial encounter addressing an emergency may evolve, converting subsequent statements into testimonial ones"; and (4) "regardless of the existence of an emergency, the informality of the statement and the circumstances of its acquisition . . . ." (*Blacksher, supra*, at pp. 813-815.)

Defendant asserts the statements were testimonial because the anonymous persons were not in danger and seeking help but rather they were identifying the perpetrator. However, we are not here concerned with " 'the subjective or actual purpose of the individuals involved in a particular encounter.' " (*Blacksher, supra*, 52 Cal.4th at p. 813.) The relevant inquiry is " 'the purpose that *reasonable* participants would have had, as ascertained from the individuals' statements and actions' in the given situation." (*Id*. at p. 813; italics added.) In other words, "when viewed objectively, what is the *primary* purpose of both declarant and officer?" (*Id*. at p. 814.) "Even when a threat to an initial victim is over, a threat to first responders and the public may still exist." (*Ibid.*) Objectively viewing the circumstances in this case there is no reasonable basis to conclude the anonymous persons' identifications of defendant as the shooter were made or received "to create an out-of-court substitute for trial testimony." (*Id*. at p. 816.) The primary purpose of both the anonymous persons and McGoldrick "was to determine defendant's whereabouts and evaluate the nature and extent of the threat he posed." (*Ibid*.) Nor can we draw a reasonable inference that the anonymous persons' statements

---

[12] Although the United States Supreme Court has not yet determined whether " ' "statements made to someone other than" ' a law enforcement officer might be testimonial [citation]," we assume for purposes of our discussion that McGoldrick, a uniformed firefighter, may be considered an officer who is "required by law to assist in police investigations." (*Blacksher, supra,* 52 Cal.4th at p. 813 & fn. 27.)

24

were not "the ' " 'sincere expression' " ' of the speaker[s'] ' " 'actual impressions and belief.' " ' " (*Id*. at p. 810.) Thus, even if the matter was before us, we would conclude defendant's confrontation clause rights had not been violated because the anonymous persons' statements were not testimonial. (*Id*. at pp. 810-811, 817 [witness's out-of-court statements identifying defendant as shooter made to police officer shortly after incident were not testimonial as "[i]t was objectively reasonable to believe that an armed shooter remained at large and presented an emergency situation," and the "primary purpose for both [witness and police] was to determine defendant's whereabouts and evaluate the nature and extent of the threat he posed"]; see *Bryant, supra*, 131 S.Ct. at pp. 1164, 1167 [victim's out-of-court statements identifying defendant as shooter made to police officer were not testimonial as statements were made during continuing emergency that went beyond any private dispute between the victim and defendant and neither victim nor police knew current location of armed shooter].)

C.      *Defendant's Prior Uncharged Gunpoint Chain Snatching Incident Involving the Victim*

1.      **Relevant Facts**

Before the jury heard the testimony of Shaunte Spruell, the victim's mother, the court held an Evidence Code section 402 hearing to consider whether the witness would be allowed to testify regarding certain statements the victim made to her. At the hearing, Spruell testified that about two weeks before the shooting the victim told her about a nighttime incident that occurred at the house of the victim's girlfriend. As the victim left the house, he was approached by defendant and another man. Defendant "pulled a gun on" the victim and the other man snatched a chain from the victim's neck. The prosecutor argued the proffered testimony was nonhearsay offered for the limited purpose of demonstrating defendant's motive and intent. In response to the court's inquiry, the prosecutor argued the motive behind the shooting was gang-related, and defendant had committed the chain snatching with a "documented person in the Eddy Rock gang" and "identified on the gang injunction," and "[n]ot only does [defendant] have it in for [the victim], but his whole crew has it in for [the victim] any time he's around the Eddy Rock

area." Defendant objected to the admission of the evidence on the ground that Spruell's testimony would be more prejudicial than probative. The trial court ruled Spruell would be allowed to testify as to the uncharged gunpoint chain snatching to show defendant's motive.

## 2. Analysis

Defendant argues the trial court committed both federal constitutional and state law error by admitting into evidence Spruell's testimony regarding the prior gunpoint chain snatching incident. We disagree.

Even if it is weak, "[e]vidence is relevant if it tends ' "logically, naturally and by reasonable inference" to establish material facts such as identity, intent, or motive.' " (*People v. Williams* (2008) 43 Cal.4th 584, 633-634; see *People v. Clark* (1992) 3 Cal.4th 41, 127 ["[e]vidence of motive was relevant to the disputed issue of identity"].) "Without doubt, evidence a defendant committed an offense on a separate occasion is inherently prejudicial. [Citations.] But Evidence Code section 352 requires the exclusion of evidence only when its probative value is *substantially* outweighed by its prejudicial effect. 'Evidence is substantially more prejudicial than probative [citation] [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." ' " (*People v. Tran* (2011) 51 Cal.4th 1040, 1047; see *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550 [" '[b]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' "].)

We conclude the trial court did not abuse its discretion in refusing to exclude Spruell's testimony. The evidence of defendant's prior confrontation with the victim was more than "minimally relevant to any legitimate purpose"—demonstrating defendant's motive in committing the charged offenses—and was not "a dominant part of the evidence against" defendant. (*People v. Collie* (1981) 30 Cal.3d 43, 64 (*Collie*).) Defendant contends Spruell's testimony should have been excluded because the information about the incident came from the victim who had an obvious interest in the outcome of the trial, the victim failed to appear in court and could lodge accusations

without fear he would be held accountable, a police report was not filed regarding the incident, and there was no corroborating evidence suggesting the incident even occurred. However, these arguments go to the weight of the evidence, not its admissibility. The testimony of the prior gunpoint chain snatching incident was no more inflammatory than the testimony about the charged offenses of attempted premeditated murder and assault with a semi-automatic pistol in broad daylight on Easter Sunday. Although the court did not give a limiting instruction on the use of the Spruell's testimony, " 'it was obvious for what purpose [the challenged evidence] was being admitted.' " (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1053 (*Hernandez*); see *Collie, supra,* at pp. 63-64 [court has no sua sponte duty to give limiting instruction on evidence of defendant's past criminal conduct].)[13] "Evidence of past offenses may not improperly affect the jury's deliberations if the facts are equivocal, the charged offense is dissimilar, or the evidence is obviously used to effect one or more of the many legitimate purposes for which it can be introduced." (*Collie, supra,* at p. 64.) This is not one of those extraordinary cases in which the court's failure to give a limiting instruction requires reversal because the challenged evidence was " 'a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose.' " (*Hernandez, supra,* at pp. 1051-1052.) On this record it is neither reasonably probable nor substantially likely that the jury would have reached a more favorable decision had the court given a limiting instruction.

We also see no merit to defendant's arguments that the admission of Spruell's testimony without a limiting instruction violated his right to due process. "To the extent defendant on appeal raises a federal constitutional claim distinct from his claim that the trial court abused its discretion [in admitting the challenged evidence], he forfeited this claim by failing to identify that ground in his objections to the trial court. [Citation.] To

---

[13] In closing argument the prosecutor referred to Spruell's testimony as evidence of defendant's motive for the shooting. In response, defense counsel attacked Spruell's testimony, noting the prior chain snatching incident had not been reported to the police, and the evidence was not admitted for its truth but on the issue of motive.

the extent any constitutional claim is merely a gloss on the objection raised at trial, it is preserved but is without merit because the trial court did not abuse its discretion." (*Riggs*, *supra*, 44 Cal.4th at p. 292.)

### D.      *Gang Expert's Testimony*

Defendant challenges the admission of Officer Jackson's testimony as a gang expert on the ground that the witness was allowed to testify to numerous hearsay to support his opinions.  Defendant specifically objects to "statements in police reports about criminal conduct committed by Eddy Rock members; statements in police reports that [defendant] was hanging out with Eddy Rock members; and statements by members of other rival gang members that [defendant] was in fact an Eddy Rock gang member." According to defendant, the admission of this evidence "violated [his] right of confrontation" and his "due process right not to have unreliable hearsay admitted at trial." We conclude defendant's contentions do not require reversal.

" 'Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (*Id*., subd. (a).)  The subject matter of the culture and habits of criminal street gangs . . . meets this criterion.' [Citation.]" (*People v. Vang* (2011) 52 Cal.4th 1038, 1044 (*Vang*).)  Additionally, "[d]espite the circumstance that it is the jury's duty to determine whether the prosecution has carried its burden of proof beyond a reasonable doubt, opinion testimony may encompass 'ultimate issues' within a case.  Evidence Code section 805 provides that '[t]estimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.' " (*People v. Prince* (2007) 40 Cal.4th 1179, 1227 (*Prince*), quoting *People v. Valdez* (1997) 58 Cal.App.4th 494, 507 (*Valdez*).) "Because an expert's need to consider extrajudicial matters and a jury's need for information sufficient to evaluate an expert opinion may conflict with an accused's interest in avoiding substantive use of unreliable hearsay, disputes in this area must generally be left to the trial court's sound judgment. " (*Id. at* p. 510.)

We conclude the trial court properly allowed Officer Jackson to testify that his opinions were based, in part, on information derived from his personal conversations with rival gang members and police reports prepared by other officers. (Evid. Code, § 801, subd. (b);[14] *People v. Gonzalez* (2006) 38 Cal.4th 932, 949 (*Gonzalez*) [gang expert allowed to testify that his opinion "was not based on information from a single person but on 'corroborative information from other citizen informants, other evidence that we have at hand, reports, people from the community' "]; *People v. Hill* (2011) 191 Cal.App.4th 1104, 1124 (*Hill*) [gang expert's opinion may be based on "hearsay statements of gang members"]; *Valdez, supra*, 58 Cal.App.4th at p. 507 [gang expert allowed to testify that defendant was member of particular gang and his activities were undertaken on behalf of the gang].) "A gang expert's overall opinion is typically based on information drawn from many sources and on years of experience, which in sum may be reliable. (*People v. Gardeley* [(1996)] 14 Cal.4th [605], 620 [(*Gardeley*)].)" (*Gonzalez, supra*, 38 Cal.4th at p. 949.) At no time did Officer Jackson testify that he based his opinions solely on the information that defendant now challenges on appeal. "Challenging the reliability [of the information is], and in fact [was] here, [a matter] for cross-examination." (*Valdez, supra*, 58 Cal.App.4th at p. 507, fn. 11.)

Defendant also contends Officer Jackson's testimony was erroneously admitted because (1) the hearsay was being elicited to prove the truth of the statements in the

---

[14] Evidence Code section 801 reads, in pertinent part: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] . . . [¶] [b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." (*Id.*, subd. (b).) "[N]o statute prohibits an expert from expressing an opinion regarding whether a crime was gang related. Indeed, it is settled that an expert may express such an opinion. To the extent the expert may not express an opinion regarding the actual defendants, that is because the jury can determine what the defendants did as well as an expert, not because of a prohibition against the expert opining on the entire subject." (*Vang, supra*, 52 Cal.4th at p. 1052.)

29

police reports and the statements of rival gang members, rather than as the basis for the officer's opinions, and (2) the hearsay was testimonial in nature and therefore violated his rights under the confrontation clause as enunciated in *Crawford* and its progeny. However, defendant made no objections to Officer Jackson's testimony on the specific grounds he now asserts on appeal. Consequently, those arguments have been forfeited for review since the trial court never had a chance to rule on the objections. (*People v. Lindberg* (2008) 45 Cal.4th 1, 48.) "[W]e cannot hold the trial court abused its discretion in rejecting [claims] that [were] never made." (*People v. Valdez* (2004) 32 Cal.4th 73, 109 (*Valdez*).)

Even if defendant's claims were properly before us, we would conclude he has failed to demonstrate that the admission of the challenged evidence constituted prejudicial error. Defendant properly concedes Officer Jackson's opinions were not based solely on information he gleaned from police reports and investigative efforts regarding gang members. We also see no merit to defendant's contention that his confrontation clause rights were violated by the admission of Officer Jackson's testimony regarding accusations by rival gang members that defendant was a member of Eddy Rock. Officer Jackson's expertise was acquired, in part, from hundreds of both *consensual* and investigatory conversations with gang members. The conversations concerned the lifestyles and attitudes of criminal street gang members and how gang members committed crimes. Defendant points to no evidence demonstrating that the rival gang members were "under arrest or that the circumstances surrounding the conversation[s] were sufficiently formal that [their] statements were analogous to testimony." (*Hill, supra,* 191 Cal.App.4th at p. 1135.) "We have no basis for concluding [Officer Jackson's conversations] were part of a specific criminal investigation or that any participant in these conversations had, as a primary purpose, 'to establish or prove some past fact for possible use in a criminal trial.' " (*Id*. at p. 1136.) Consequently, even if the matter were before us, we would conclude that the record does not show that Officer Jackson's testimony as to what he was told by rival gang members was testimonial hearsay admitted in violation of defendant's confrontation clause rights.

30

**II.     Sufficiency of Evidence to Support Gang Enhancements**

Defendant challenges the sufficiency of the evidence to support the jury's findings that he violated section 186.22, subdivision (b), which creates a sentencing enhancement for "a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (*Ibid*.)  However, he "presents a selective view of the evidence and disregards the reasonable inferences supporting the judgment. [¶] We are not free to follow [defendant's] carefully winnowed approach to the evidence.  We must review the entire record in the light most favorable to the judgment.  Whether the evidence is direct or circumstantial, our inquiry is to determine if any reasonable trier of fact could have" made true findings as to the gang enhancements.  (*In re Nathaniel C.* (1991) 228 Cal.App.3d 990, 998-999.)  "An appellate court's belief that the circumstantial evidence can reasonably be reconciled with innocence does not warrant interference with the determination of the trier of fact.  [Citation.]  Under these rules, we believe that the evidence is contrary to the view espoused by [defendant]." (*Id*. at p. 999.)

Our Supreme Court has repeatedly and consistently held that the testimony of an expert like Officer Jackson, standing alone, is sufficient evidence from which a jury can reasonably find all elements necessary to support a true finding on a section 186.22, subdivision (b) gang enhancement.  (See, e.g., *Vang, supra,* 52 Cal.4th at p. 1049; *People v. Albillar* (2010) 51 Cal.4th 47, 63; *Hernandez, supra*, 33 Cal.4th at pp. 1047-1048; *Gardeley*, *supra,* 14 Cal.4th at p. 619.)  Like the expert in *Gardeley,* Officer Jackson's testimony regarding the Eddy Rock criminal street gang and defendant's participation in the gang was based on his personal knowledge (including numerous contacts with gang members, including executing a search warrant at defendant's home, and discussions

with rival gang members), as well as information he gleaned from police reports regarding the criminal and other activities of defendant and other gang members.[15]

Officer Jackson explained how the Eddy Rock gang acquired and lost members over time, and defendant's association with the gang. To the extent defendant asks us to consider certain evidence from which different inferences could be drawn, we decline to do so. We assume the jury disregarded those portions of the record and the inferences to be drawn from the evidence relied on by defendant. (See *People v. Davis* (1957) 48 Cal.2d 241, 248 ["the jury might have accepted a portion of [the] testimony and disbelieved the remainder"].) There is nothing in Officer Jackson's testimony that would negate, as a matter of law, the jury's implicit determination that at the time of the April 2009 shooting, Eddy Rock was an ongoing criminal street gang and that defendant was a participant or associate of the gang. "[W]e may not reverse the judgment simply because the circumstances might also reasonably be reconciled with defendant's alternate theories." (*People v. Farnam* (2002) 28 Cal.4th 107, 144.)

Relying on *People v. Killebrew* (2002) 103 Cal.App.4th 644, 658, and *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199, defendant also contends an expert may not testify as to a defendant's specific intent to promote, further, or assist in the criminal conduct of gang members. However, we read those cases as "merely 'prohibit[ing] an expert from testifying to his or her opinion of the knowledge or intent of a defendant on trial.' " (*Gonzalez, supra*, 38 Cal.4th at p. 946.) Here, Officer Jackson "did not render an impermissible opinion as to defendant's actual intent; rather [he] properly testified as to defendant's motivations for his actions." (*Ward, supra,* 36 Cal.4th at p. 209; see

---

[15] To the extent defendant complains Officer Jackson was allowed to testify as to his opinions without the use of hypotheticals, this contention was not raised in the trial court and therefore it is not properly before us. (*Valdez, supra,* 32 Cal.4th at p. 109.) In any event, we see no basis to reverse on this ground. (*People v. Wilson* (1944) 25 Cal.2d 341, 349 ["[t]here is no hard and fast rule that the expert cannot be asked a question that coincides with the ultimate issue in the case"]; see also *People v. Ward* (2005) 36 Cal.4th 186, 209 (*Ward*) [court upheld prosecutor's use of "fact-specific hypothetical questions to elicit testimony from [these] experts that a gang member going into rival gang territory— like defendant—would do so as a challenge and would protect himself with a weapon"].)

*Gardeley, supra*, 14 Cal.4th at p. 619; *Valdez, supra,* 58 Cal.App.4th at p. 507.) Officer Jackson explained why he believed defendant was an active participant in the Eddy Rock gang, and how the act of attempting to murder someone in broad daylight could benefit the gang. The prosecutor's questions "were directed to helping the jury determine whether [this defendant], not someone else, committed a crime for a gang purpose. Disguising this fact would only have confused the jury." (*Vang, supra*, 52 Cal.4th at p. 1046.) The jury, as the trier of fact, was left to determine, if, based on the totality of the evidence, defendant's attempt to murder and assault the victim benefited the gang. Officer Jackson's "conclusion . . . did not bind the jury, nor would [his] testimony be understood as essentially directing a verdict." (*Prince, supra,* 40 Cal.4th at p. 1227.)[16]

## III. Sufficiency of Evidence Supporting the Substantive Offense of Active Gang Participation

We agree with defendant that his conviction for the substantive offense of active gang participation (count three) (§ 186.22, subd. (a))[17] must be reversed on the grounds

---

[16] Defendant's reliance on *People v. Martinez* (2004) 116 Cal.App.4th 753, 762 (*Martinez*) is misplaced. That case concerned a section 186.30 gang registration requirement, which was imposed after the defendant had pleaded guilty to unlawful sexual intercourse with a minor and auto burglary. (*Martinez, supra,* at p. 758.) The *Martinez* court struck the gang registration requirement because there was no evidence that the auto burglary was "gang-related" within the meaning of section 186.30. (*Martinez, supra*, at pp. 762-763.) In so ruling, the court explained that because the appeal followed "a plea, we of course do not have any expert testimony in the record that explains the relationship of the crime to a criminal street gang." (*Id*. at p. 762, fn. 8.) It is in that context (the absence of any expert testimony) that the *Martinez* court found the defendant's record of prior offenses and past gang activities or personal affiliations was insufficient to support imposing the requirement of gang registration. (*Id*. at p. 762.) Here, however, we have gang expert testimony, coupled with defendant's record of past gang affiliations and activities, which supports the jury's true findings on the gang enhancements.

[17] Section 186.22, subdivision (a), reads, in pertinent part: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished . . . ."

33

of insufficient evidence. Since oral argument in this matter, a majority of our Supreme Court has concluded that section 186.22, subdivision (a), is not violated when a gang member commits a felony while acting alone. (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1128, 1132, 1134.) In this case the information alleged that defendant committed the active gang participation offense on or about April 12, 2009, which was the same time frame as the attempted murder and assault offenses against Greer. Additionally, the evidence shows that the only felonious criminal conduct that occurred on or about April 12, 2009, was the attempted murder and assault offenses against Greer. Because defendant acted alone in committing the attempted murder and assault, he did not also violate section 186.22, subdivision (a). Consequently, we reverse the conviction for active gang participation (count three), the true findings of the sentence enhancements related to that count, and vacate the imposed sentences. The trial court will be directed to dismiss count three and the sentence enhancements related to that count and amend its sentence minute order and the abstract of judgment accordingly.[18]

## IV. Alleged Ineffective Assistance of Trial Counsel

Defendant argues his trial counsel was ineffective based on various acts and omissions, including counsel's opening of the door to the admission of the victim's statement identifying defendant as the shooter, counsel's failures to make certain contemporaneous objections to the admission of evidence and the prosecutor's closing arguments, and to request certain limiting instructions. As we now discuss, we conclude defendant has failed to meet his burden of demonstrating his trial counsel was incompetent.

In analyzing an alleged ineffective assistance of counsel claim, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' "

---

[18] In light of our determination, we need not address defendant's argument concerning the omissions in the court's instruction on the offense of active gang participation (count three).

34

(*Strickland v. Washington* (1984) 466 U.S. 668, 689; see *Harrington v. Richter* (2011) 562 U.S. ___, ___ [131 S.Ct. 770, 787 [defendant's "burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' "].)  We " 'will reverse on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.' " (*People v. Cox* (1991) 53 Cal.3d 618, 659 (*Cox*), disapproved on other grounds by *Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.)

Here, "[t]hrough a selective reading of the record with considerable hindsight, defendant speculates a more favorable determination would have resulted from other possible courses; yet he has failed to establish as a demonstrable reality any professional lapse in the defense actually employed. " (*Cox, supra*, 53 Cal.3d at p. 662.)  "The decisions which counsel must make in the courtroom will necessarily depend in part upon what he then knows about the case, including what his own client has told him.  There may be considerations not shown by the record, which could never be communicated to the reviewing court as a basis for its decision.  Thus, [our] inability to understand why counsel did as he did cannot be a basis for inferring that [counsel] was wrong." (*People v. Garrison* (1966) 246 Cal.App.2d 343, 350-351; see *Taylor v. Illinois* (1988) 484 U.S. 400, 417-418, fn. omitted ["[a]lthough there are basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client, the lawyer has—and must have—full authority to manage the conduct of the trial"]; *People v. Riel* (2000) 22 Cal.4th 1153, 1197 ["competent counsel may often choose to forego even a valid objection"]; *People v. Ervin* (2000) 22 Cal.4th 48, 94 ["[w]e rarely second-guess counsel's cross-examination tactics, despite the elicitation of seemingly damaging testimony"]; *People v. Williams* (1997) 16 Cal.4th 153, 217 ["[e]ven where defense counsel may have ' "elicit[ed] evidence more damaging to [defendant] than the prosecutor was able to accomplish on direct" ' [citation], we have been 'reluctant to second-guess counsel' [citation] where a tactical choice of questions led to the damaging testimony"].)  Defendant's appellate contentions may be asserted, if at all, in a habeas

corpus petition. (See *In re Seaton* (2004) 34 Cal.4th 193, 200; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

## V.    Cumulative Effect of Purported Errors

We reject any contention that reversal is required based on the cumulative effect of the purported errors raised on appeal. "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844-845.) This is not such a case. The record demonstrates that any purported errors, considered individually or collectively, were not so prejudicial as to deny defendant a fair trial or reliable verdicts.

## VI.    Sentencing Issues

### A.    *Determinate Sentence on Assault Conviction*

Defendant challenges the sentence imposed on his assault conviction, contending that the court erred when it imposed sentence enhancements for firearm use (§ 12022.5, subd. (a)),[19] great bodily injury (§ 12022.7, subd. (a)),[20] and commission of a felony for the benefit of a gang (§ 186.22, subd. (b)(1)(C).)[21] In addition to imposing a nine-year

---

[19] Section 12022.5, subdivision (a), reads, in pertinent part, that "any person who personally uses a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment . . . for 3, 4, or 10 years, unless use of a firearm is an element of that offense."

[20] Section 12022.7, subdivision (a), reads: "Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years."

[21] Section 186.22, subdivision (b)(1), reads, in pertinent part: "[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished as follows: [¶] . . .[¶] (C) If the felony is a violent felony, as defined in subdivision (c) of section 667.5, the person shall be punished by an additional term of 10 years." (§ 186.22, subd. (b)(1)(C).) Section 667.5, subdivision (c), enumerates the offenses that qualify as "violent" felonies, including "[a]ny felony in which the defendant inflicts great bodily injury on any person other than an accomplice which has been charged and proved as provided for in Section 12022.7,"

36

term for the substantive assault offense, the court imposed a consecutive 10-year term for the firearm-use enhancement, a consecutive 10-year term for the gang enhancement, and imposed but stayed a three-year term for the great-bodily-injury enhancement, for a total of 20 additional years. According to defendant, the court meant to impose only a total of 13 additional years for the enhancements because the court erred by (1) imposing two, instead of one, 10-year terms for the firearm-use enhancement and the gang enhancement, and (2) staying the imposed consecutive three-year term for the great-bodily-injury enhancement. We conclude defendant's contention is unavailing.

In the case of two or more enhancements for either firearm use or infliction of great bodily injury, subdivisions (f) and (g) of section 1170.1[22] "clearly bar imposing two or more weapon enhancements for the same offense (subd. (f)) and two or more great-bodily-injury enhancements for the same offense (subd. (g))." (*People v. Ahmed* (2011) 53 Cal.4th 156, 165 (*Ahmed*).) Pertinent to our discussion, a trial court may not impose both a firearm-use enhancement (§ 12022.5), and a gang enhancement predicated on a section 12022.5 weapon enhancement (§ 186.22, subd. (b)(1)(C), see § 667.5, subd. (c)(8)), because both enhancements qualify as weapon enhancements within the meaning

---

or "any felony in which the defendant uses a firearm which use has been charged and proved as provided in . . . Section 12022.5." (§ 667.5, subd. (c)(8).) Thus, in this case the assault is deemed a "violent felony" within the meaning of section 667.5, subdivision (c)(8), based on *either* the section 12022.5, subdivision (a), firearm-use enhancement *or* the section 12202.7, subdivision (a), great-bodily-injury enhancement. (See § 667.5, subd. (c)(8).)

[22] Section 1170.1, reads, in pertinent part: "(f) When two or more enhancements may be imposed for being armed with or using a dangerous or deadly weapon or a firearm in the commission of a single offense, only the greatest of those enhancements shall be imposed for that offense. This subdivision shall not limit the imposition of any other enhancements applicable to that offense, including an enhancement for the infliction of great bodily injury. [¶] (g) When two or more enhancements may be imposed for the infliction of great bodily injury on the same victim in the commission of a single offense, only the greatest of those enhancements shall be imposed for that offense. This subdivision shall not limit the imposition of any other enhancements applicable to that offense, including an enhancement for being armed with or using a dangerous or deadly weapon or a firearm."

37

of section 1170.1, subdivision (f).  (See *People v. Rodriguez* (2009) 47 Cal.4th 501, 508-509 (*Rodriguez*).)  Similarly, a trial court may not impose both a great-bodily-injury enhancement (§ 12022.7), and a gang enhancement predicated on a section 12022.7 great-bodily-injury enhancement (§ 186.22, subd. (b)(1)(C), see § 667.5, subd. (c)(8)), because both enhancements qualify as great-bodily-injury enhancements within the meaning of section 1170.1, subdivision (g).  (See *People v. Gonzalez* (2009) 178 Cal.App.4th 1325, 1332 (*Gonzalez*) [citing to the dual weapon enhancement analysis in *Rodriguez, supra,* at pp. 508-509, in addressing imposition of sentence on dual great-bodily-injury enhancements].)  However, a trial court can impose sentence on "both one weapon enhancement and one great-bodily-injury enhancement for the same crime when both apply."  (*Ahmed, supra*, at p. 165; see *id.* at p. 162 [court upheld applying one firearm-use and one great-bodily-injury enhancement because "defendant both used a firearm and inflicted great bodily injury when he shot his victim"].)

In this case defendant was subject to two enhancements for firearm use: one pursuant to section 12022.5, subdivision (a), and one pursuant to section 186.22, subdivision (b)(1)(C), for which the court could only impose "the greatest of those enhancements."  (§ 1170.1, subd. (f); see *Rodriguez, supra*, 47 Cal.4th at pp. 508-509.)  Defendant was also subject to two enhancements for the infliction of great bodily injury: one pursuant to section 12022.7, subdivision (a), and one pursuant to section 186.22, subdivision (b)(1)(C), for which the court could impose "only the greatest of those enhancements."  (§ 1170.1, subd. (g); see *Gonzalez, supra,* 178 Cal.App.4th at p. 1332.)  By imposing a consecutive 10-year term on the section 12022.5, subdivision (a), firearm use enhancement, the trial court did not impose a term for the second firearm-use enhancement pursuant to section 186.22, subdivision (b)(1)(C), following the mandate of section 1170.1, subdivision (f). [23]  (*Rodriguez, supra*, 47 Cal.4th at pp. 508-509.)

---

[23]  By choosing to impose a 10-year term on the section 12022.5, subdivision (a), enhancement, the court did not actually impose the "greatest" of the firearm-use enhancements.  However, the court appropriately recognized that only one consecutive

Instead, the trial court chose to impose a consecutive 10-year term on the gang enhancement predicated on the section 12022.7 great-bodily-injury enhancement (§ 186.22, subd. (b)(1)(C), which was "the greatest of [the great-bodily-injury] enhancements (§ 1170.1, subd. (g)," and stayed the three-year term imposed on the section 12022.7, subdivision (a), great-bodily-injury enhancement. Thus, the court's sentence complied with section 1170.1, subdivisions (f) and (g), which allows " 'a judge to impose the greatest enhancement (that is charged and proven) for use of a weapon, as well as the greatest enhancement (that is charged and proven) for infliction of [great bodily injury].' " (*Ahmed, supra*, 53 Cal.4th at p. 168, quoting from the legislative history materials filed with the 1997 amendment to § 1170.1, replacing former subd. (e) with subds. (f) & (g).)[24] Defendant makes no argument that assuming the trial court's sentencing choices were authorized, the imposed sentence on the assault conviction was "irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objections, and its discretionary determination to impose a particular sentence will not be set aside on review." (*People v. Superior Court (Du)* (1992) 5 Cal.App.4th 822, 831.)

However, we agree with defendant that the trial court erred when at sentencing it orally pronounced the aggregate term imposed on the assault conviction was 32 years. The court actually imposed an aggregate term of 29 years. On remand the trial court should amend its sentence minute order and the abstract of judgment to reflect that the aggregate term imposed on the assault conviction (count two) is 29 years and that the "total time excluding county jail term" reflected in paragraph 8 of the determinate sentence abstract of judgment is 29 years.

---

10-year term could be imposed for the multiple firearm-use enhancements, and it designated the specific enhancement on which it chose to impose sentence.

[24] "Because section 1170.1 provides the answer" to whether the trial court properly imposed both the firearm-use enhancement and the gang enhancement in this case, "we do not consider section 654." (*Ahmed, supra*, 53 Cal.4th at p. 168.) Consequently, we see no reason for supplemental briefing on the issue as suggested by defendant in his reply brief.

### B. *Defendant's Financial Obligations*

Defendant also challenges the court's imposition of restitution fines (§ 1202.4, subd. (b)).[25] In pertinent part, the court imposed restitution fines as follows: $10,000 on count one and $6,400 on count two. The parties agree, and we concur, the court could impose a restitution fine of no more than $10,000, regardless of the number of counts. (*People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1534; see *People v. Le* (2006) 136 Cal.App.4th 925, 933-934 [in calculating amount of restitution fine under formula in § 1202.4, subd. (b)(2), trial court may not use a felony conviction for which the sentence has been stayed pursuant to § 654].) Accordingly, on remand the trial court should amend its sentence minute order and the abstracts of judgment to reflect that defendant's financial obligation is a restitution fine of $10,000, and a related parole revocation fine (§ 1202.45) of $10,000, imposed on the attempted murder conviction (count one) and no restitution or parole restitution fines are separately imposed on the assault conviction (count two). The abstract of judgment of the determinate sentences on the assault conviction (count two) indicates in paragraph 11 that "all matters" reflected in that abstract are stayed pursuant to section 654. However, we agree with the parties that the trial court should amend its sentence minute order and the abstracts of judgments as we have directed to clarify defendant's financial obligations. Additionally, the trial court's oral pronouncement of sentence and its sentence minute order correctly indicate there was no stay of the imposed court security fees (§ 1465.8)[26] and court facility funding assessments (Gov. Code, § 70373, subd. (a))[27] on the assault conviction (count two). (*People v. Woods* (2010) 191 Cal.App.4th 269, 272 [court security fee and court facility

---

[25] Since defendant's sentence the Legislature has twice amended section 1202.4. (Stats. 2010, ch. 107, § 1; Stats. 2010, ch. 351, § 9.) These amendments are not pertinent to this appeal.

[26] Since defendant's sentence the Legislature has amended section 1465.8 redesignating the court security fee as an "assessment" to "assist in funding court operations." (Stats. 2011, ch. 40, § 6.)

[27] In the trial court this assessment was referred to as an "immediate critical needs assessment fee," pursuant to Government Code section 70373, subdivision (a).

funding assessment, both mandatory and applicable to each conviction, are not subject to § 654 stay].)  Therefore, on remand the trial court should amend the abstract of judgment of the determinate sentences to accurately reflect that defendant's financial obligations for the court security fees and court facility funding assessments imposed on the assault conviction (count two) are not stayed.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 187 [Court of Appeal may direct correction of clerical error in abstract of judgment without request of either party].)

## DISPOSITION

The conviction for active gang participation (§ 186.22, subd. (a)) (count three) and the true findings on the sentence enhancements related to that count are reversed, the sentences imposed are vacated, and the trial court is directed to dismiss that count and the sentence enhancements related to that count.  In all other respects, the judgment is affirmed.  The matter is remanded to the trial court for the issuance of an amended sentence minute order and amended abstracts of judgment consistent with this opinion. The trial court shall transmit certified copies of the amended abstracts of judgment to the Department of Corrections and Rehabilitation.


_____
McGuiness, P.J.


We concur:


_____
Siggins, J.


_____
Jenkins, J.


41